## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHARLENE M. ERVIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 10-886-SLR-SRF |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff Sharlene M. Ervin ("Ervin" or "plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of the Social Security Administration ("Commissioner" or "defendant"),[1] denying her claims for disability insurance benefits ("DIB") and child's insurance benefits ("CIB") under Title II of the Social Security Act, and denying her claims for supplemental security income ("SSI") under Title XVI of the Social Security Act. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently before the court are cross-motions for summary judgment filed by Ervin and the Commissioner. (D.I. 13, 16) Ervin seeks reversal of the Commissioner's decision and remand for further proceedings. (D.I. 14) The Commissioner requests that the decision of the administrative law judge ("ALJ") be affirmed. (D.I. 17) For reasons set forth below, I recommend that the court deny Ervin's motion for summary judgment and grant the Commissioner's cross-motion for summary judgment.

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

## II.    BACKGROUND

### A.    Procedural History

Ervin filed claims for DIB and CIB on May 13, 2008, alleging disability since January 1,

2004. (D.I. 11 at 143-56)  On May 14, 2008, Ervin amended her application for benefits to

reflect a disability onset date of October 1, 2006. (*Id.* at 157-58)  Ervin's claims for DIB and

CIB were denied initially on December 18, 2008 and on reconsideration on March 9 2009. (*Id.*

at 63-65, 67-77)  On January 27, 2009, Ervin protectively filed an application for SSI. (*Id.* at

159-65)  Ervin's claim for SSI was denied on March 9, 2009. (*Id.* at 66, 78-82)  Thereafter,

Ervin requested a hearing before an ALJ, which took place on January 14, 2010. (*Id.* at 93-94,

120-39)  Counsel represented Ervin at the hearing, and both Ervin and a vocational expert

("VE") testified. (D.I. 22 at 612-43)

On February 18, 2010, the ALJ issued an unfavorable decision, finding Ervin not

disabled and denying her claims for DIB, CIB, and SSI. (D.I. 11 at 10-25)  The ALJ found that

Ervin was not disabled and could perform a limited range of light work available in the national

economy. (*Id.*)  Ervin requested a review of the ALJ's decision by the Appeals Council, but it

denied the request for review and, therefore, the ALJ's decision became the final decision of the

Commissioner subject to judicial review. (*Id.* at 1-3)  On October 15, 2010, Ervin filed the

current action for review of the final decision. (D.I. 2)

### B.    Factual Background

#### 1.    Medical History

On September 7, 2006, Ervin was seen by Dr. Barbara Belford, Ph.D., for a psychiatric

assessment. (D.I. 11, Tr. at 426)  Dr. Belford noted that Ervin exhibited symptoms of a

depressed mood, anxiety, worthlessness, and suicidal ideation, and determined that these

2

symptoms moderately impaired Ervin's functional abilities. (*Id.*) Ervin saw Dr. Belford for three follow-up visits between December 2007 and May 2008. (*Id.* at 423-25) During these visits, Dr. Belford observed that Ervin's symptoms markedly impaired Ervin's functional abilities and noted no improvement. (*Id.*) In a letter dated May 30, 2008, Dr. Belford diagnosed Ervin with bipolar disorder, observed that Ervin failed to follow through with counseling or medication, and opined that she would be unable to sustain competitive employment. (*Id.* at 422)

From December 19, 2006 to July 17, 2007, Ervin was seen by Diane Necastro, a licensed clinical social worker at Delaware Guidance Services for Children and Youth, for psychiatric evaluation and treatment. (*Id.* at 266-67) Ms. Necastro diagnosed Ervin with major depressive disorder due to her history of self-harm, anxiety attacks, and depression, and gave her a global assessment of functioning ("GAF")[2] score of 41, with a highest GAF within the last year of 34. (*Id.*) Over the course of treatment, Ms. Necastro observed moderate progress in Ervin's anxiety attacks, and slight progress in Ervin's actions of self-harm and depression. (*Id.* at 266) Ms. Necastro noted that Ervin had previously taken Zoloft, but was noncompliant and had stopped taking the medication by February 2007. (*Id.* at 267) When Ervin turned 18 in July 2007, her case was closed and she was referred to Pathways at Wilmington Hospital for treatment. (*Id.* at 266)

Ervin was admitted to the emergency room on September 23, 2007, October 9, 2007, and January 3, 2008 for depression. (*Id.* at 338-47; 370-411) A psychiatric assessment performed in the emergency room reflected that she had a history of suicidal thoughts, self-mutilation, and aggression, and she had difficulty functioning at work or school. (*Id.* at 409) On January 3,

---

[2] The Global Assessment of Functioning scale ranges from 0 to 100 and considers psychological, social and occupational functioning on a hypothetical continuum of mental health illness. Diagnostic & Statistical Manual of Mental Disorders ("DSM-IVR") 34 (4th ed. 2000).

2008, Ervin presented with self-inflicted lacerations caused by a razor blade, and had taken

Trazadone, cough syrup with codeine, and Motrin. (*Id.* at 340, 345)

On January 4, 2008, Ervin was assessed at Rockford Center. (*Id.* at 268-70)  During her

psychiatric assessment, Ervin acknowledged that she had a history of cutting herself since age 10

due to stress and frustration, and experienced auditory and visual hallucinations as a child. (*Id.*

at 268)  Ervin claimed that she had no current hallucinations or suicidal or homicidal ideations.

(*Id.*)  As of January 4, 2008, she did not have outpatient psychiatric treatment and was on no

medication. (*Id.* at 268-69)  She was diagnosed with general depressive disorder. (*Id.* at 269)

Ervin began treating with Praful C. Desai, M.D. in October 2007. (*Id.* at 272)  During a

visit on January 9, 2008, Dr. Desai wrote that Ervin "continues to have lots of mood swings" and

"feels angry, frustrated, feels like cutting herself." (*Id.* at 271)  Dr. Desai indicated that Ervin

continued "to hear voices telling her to fight others – her own voice coming from within" and at

times had a "movie in her head about how she will hurt somebody else." (*Id.*)  According to Dr.

Desai, Ervin also experienced anxiety. (*Id.*)

Ervin returned to Rockford Center in July 2008. (*Id.* at 482-83)  Her discharge papers

indicated that she had no education or vocational plans following her discharge, but she planned

to focus on being compliant with her medication. (*Id.* at 482)  Her discharge medications

included Geodon, Wellbutrin, Cogentin, and Trazadone. (*Id.* at 483)

On September 11, 2008, Ervin was examined by state agency physician Robert G.

Thompson, Psy.D. (*Id.* at 496-506)  Dr. Thompson's notes reveal that Ervin had not worked in

over a year at the time of the examination, and had previously held a retail job for about two

years. (*Id.* at 496)  During the examination, Ervin explained that she suffered from depression

and had been admitted to a psychiatric hospital in July 2008 for eight days of inpatient care,

followed by outpatient treatment, after attempting to commit suicide. (*Id.* at 497-99) Ervin described experiencing mood changes, suicidal thoughts and impulses, social isolation, and eating disorders. (*Id.* at 497) Ervin admitted that she has anger problems and takes her anger out on other people. (*Id.*) She explained that she does not like to be around other people and prefers not to leave her house, especially unaccompanied. (*Id.* at 497-98) At the time of the examination, she was not taking any medications because she had run out and had not seen a physician to obtain refills. (*Id.* at 498) Ervin denied any significant history of drug or alcohol abuse. (*Id.* at 499)

Dr. Thompson observed that Ervin was neatly dressed, alert, and oriented to time, place, and person, but she made very little eye contact. (*Id.* at 500-01) She did not have difficulty paying attention or concentrating during the one-hour exam. (*Id.*) Her short-term and long-term memory were not formally assessed but appeared to be grossly intact. (*Id.* at 501) Ervin reported severe depressive symptoms, such as suicidal thoughts, that became the focus of the examination. (*Id.* at 501) Dr. Thompson perceived Ervin to be credible. (*Id.*) Ervin spoke in a monotonous tone of voice, and her speech was slow in rate and soft in volume, but well-articulated, intelligible, and relevant to the discussion topics. (*Id.*) Her facial expressions were bland and conveyed little emotion. (*Id.*) Her affect was depressed and was consistent with her thoughts and expressions. (*Id.*) Ervin explained that she had experienced intermittent thoughts of suicide since the time of her discharge from the Rockford Center in July 2008. (*Id.*) She indicated that she had no intention of acting on her thoughts of suicide and is hopeful about being more self-reliant in the future. (*Id.*) Ervin indicated that she often experiences her conscience talking to her, but denied hearing voices telling her to harm herself or someone else. (*Id.* at 502)

Dr. Thompson emphasized that his findings were based on a one hour examination of Ervin occurring during a time when she appeared to be significantly depressed. (*Id.* at 503) As such, he was unable to state with certainty the degree to which his assessment was reflective of Ervin's baseline functioning, and suggested that she may function much higher if stabilized psychiatrically. (*Id.*) Dr. Thompson expressed concern that Ervin had continued to experience severe symptoms of depression without receiving medication or psychotherapy, and advised Ervin and her mother that Ervin should seek immediate treatment for her depression. (*Id.*) Dr. Thompson considered the possibility of initiating psychiatric commitment during the examination but decided that it was not warranted due to Ervin's insistence that she did not intend to harm herself or others. (*Id.*) Dr. Thompson opined that some of Ervin's problems were related to a personality disorder, and while she may respond favorably to psychiatric medications, the medications would not necessarily cure Ervin's conditions. (*Id.* at 504)

On September 12, 2008, Ervin was admitted to the Rockford Center for psychiatric treatment. (*Id.* at 515) On admission, she was diagnosed with psychotic disorder and given a GAF score of 20. (*Id.*) Ervin responded well to medication and therapy, and upon discharge, was diagnosed with schizoaffective disorder and given a GAF score of 40. (*Id.* at 515, 516-17) She stopped experiencing auditory hallucinations and interacted appropriately with peers and staff. (*Id.* at 516) She was discharged to continue outpatient treatment with her psychiatrist, Dr. Desai. (*Id.* at 516-17)

In treatment notes from September 29, 2008, Dr. Desai noted Ervin's history of cutting herself and indicated that the last time she had done so was May 2008. (*Id.* at 518) Dr. Desai diagnosed Ervin with schizoaffective disorder. (*Id.* at 519)

State agency physician Christopher King, Ph.D. performed a psychiatric RFC assessment on December 17, 2008. (*Id.* at 522-35) Dr. King indicated that Ervin experienced mood disturbances, accompanied by a full or partial manic depressive syndrome, as evidenced by various symptoms, signs, and laboratory findings. (*Id.* at 524-25) He identified Ervin as having inflexible and maladaptive personality traits causing significant impairment in social or occupational functioning, characterizing this description as borderline personality disorder. (*Id.* at 527) He indicated that Ervin had moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and had one or two repeated episodes of decompensation of extended duration. (*Id.* at 530) He opined that Ervin was moderately limited in her ability to interact appropriately with the general public, to accept and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. (*Id.* at 534) Dr. King observed that despite Ervin's history of treatment for depression, she was not compliant with her medications. (*Id.* at 535) Dr. King concluded that Ervin would be better suited to jobs that do not require interaction with others due to her psychosocial problems. (*Id.*) Dr. King gave Dr. Thompson's assessment partial weight, concluding that Dr. Thompson's RFC ratings were not consistent with his narrative and appeared to overestimate the severity of Ervin's limitations. (*Id.*) On March 5, 2009, Carlene Tucker-Okine, Ph.D., reviewed and affirmed Dr. King's assessment. (*Id.* at 573-86)

On November 9, 2009, Ervin was admitted to the Rockford Center to stabilize her mood swings, psychosis, and anxiety. (*Id.* at 609) Ervin denied having suicidal ideation, homicidal ideation, or auditory or visual hallucinations at that time. (*Id.* at 610) Ervin's medications were adjusted, and her stressors were addressed with her mother. (*Id.* at 609) Ervin was instructed to follow up with her outpatient provider. (*Id.*)

Ervin's medical records reflect that she also suffers from asthma and frequently visited Christiana Care Health Services at Wilmington Hospital for asthma-related symptoms. (*Id.* at 378, 380, 399, 401, 418, 441-46, 452-53) The parties do not dispute the ALJ's assessment of no limitations stemming from Ervin's asthma-related symptoms.

### 2.   Non-Medical Evidence

On September 10, 2008, Ervin met with Christina L. Cody, a vocational rehabilitation counselor, for an assessment of her employability. (*Id.* at 570) Ms. Cody concluded that Ervin would initially need to work part-time to build her work tolerance, but predicted that she would successfully obtain employment if provided with the necessary services. (*Id.*) Ms. Cody made a notation to request records from Dr. Desai. (*Id.*)

### 3.   The Administrative Hearing

Ervin's administrative hearing took place on January 14, 2010. (D.I. 22, Tr. at 612-44) Ervin testified and was represented by counsel. (*Id.* at 615-38) A vocational expert also testified. (*Id.* at 638-43)

### a.   Ervin's Testimony

Ervin was twenty years old when the ALJ rendered the decision that is now the subject of review. (*Id.* at 616) She stated that she had a nervous breakdown and lost her memory at the age of fourteen. (*Id.* at 615-16) She dropped out of school when she was fourteen or fifteen due to her emotional instability. (*Id.* at 616-17) She has a tenth grade education and never obtained her GED. (*Id.*)

Ervin was employed after she dropped out of high school, holding a temporary position as a secretary in 2006, and working in a part-time retail position from 2005 to 2007. (*Id.* at 617-18) Ervin was let go from her retail position because her health issues caused her to miss too

many days. (*Id.* at 618) She has not worked since she was let go from her part-time position. (*Id.*)

Ervin described her symptoms to include visual and auditory hallucinations, as well as suicidal thoughts that prevent her from getting out of bed or eating several times per week. (*Id.* at 623-24) Ervin indicated that on a typical day, she wakes up early and takes her medicine. (*Id.* at 625) She does small chores around the house, and about three or four times a month she goes out with friends. (*Id.*) Ervin testified that she is single, has no children, and receives welfare. (*Id.* at 626) She lives with her mother, who works. (*Id.*) She testified that she can sit for about ten or fifteen minutes on occasion. (*Id.* at 627) She experiences suicidal thoughts every day, primarily when she is at home by herself. (*Id.* at 629-30) Her medication helps only sometimes. (*Id.* at 630) She has experienced audio and visual hallucinations for years. (*Id.* at 631-32) Ervin testified that she and her friends often argue. (*Id.* at 634-35) She had not been hospitalized for any of her conditions since November 2008. (*Id.* at 637-38)

Ervin testified that she saw Dr. Belford between 2005 and 2008 for her mental health issues, and Dr. Belford urged her to seek medical attention after concluding that Ervin was unstable. (*Id.* at 620) Ervin's family and friends staged an intervention in July 2008 and admitted her to Rockford Center because she was suicidal, cutting herself, and mixing pills with liquor. (*Id.* at 621) After her discharge from Rockford Center, she began seeing Dr. Desai about once a month. (*Id.*) Ervin returned to Rockford Center in November 2008 because she experienced suicidal ideation, auditory hallucinations, and insomnia. (*Id.* at 622)

In addition to treating with Dr. Desai, Ervin testified that she also met with her counselor, Lisa Savage, twice a week. Ms. Savage encouraged Ervin to think more positively and stay on

her medication, and she gave Ervin advice for dealing with stressful situations. (*Id.* at 623)

Ervin reported that she felt about the same as she did before receiving treatment. (*Id.*)

### b. Vocational Expert's Testimony

A vocational expert ("VE") also testified at the hearing. (*Id.* at 56) The ALJ posed the

following hypothetical to the VE:

> I'd like for you, if you would, assume a person who is 17 years and
> 3 months on her alleged onset date. Has a 10th grade education.
> She has some past relevant work but not SGA [substantial gainful
> activity]. Suffering from various impairments. She elucidated on
> asthma, which is fairly well controlled by her medications. She
> takes bronchialaters [sic]. She suffers from depression with a
> bipolar component, and some gastritis, and/or IBS. It's fairly well
> controlled with her medications. But she indicates she still derives
> some constipation. And she has a small hiatal hernia but no
> problem with that by testimony. All these things are somewhat
> relieved by her medications without significant side affects. But
> she indicates recently she becomes delusional on one or
> combination of her new meds. And if I find that she needs to have
> a simple, routine, unskilled job, Ms. Jenkins, low concentration,
> low memory. She's able to attend tasks and complete schedules.
> Probably SVP [specific vocational preparation] two jobs. She
> seems mildly to moderately limited in her ability to perform her
> ADL's [activities of daily living], and to interact socially, and to
> maintain her concentration, persistence, and pace. All secondary
> to her fatigue, depression, and her allergies. Jobs that would allow
> her to avoid large crowds or workers. She, the file indicates she
> might have problems with large crowds or workers. And if I find
> that she can lift 10 pounds frequently, 20 on occasion. Can sit for
> an hour, stand for an hour consistently on an alternate basis during
> an eight hour day, five days a week. But would have to avoid
> temperature and humidity extremes due to her asthmatic condition,
> odors, gases, fumes, dust like substances. But would seem to be
> able to do sedentary and light work activities. Can you give me
> jobs . . . that such a person could do, in your opinion, as a
> Vocational Expert with those limitations?

(*Id.* at 638-39) The VE responded that jobs including copier operator, library clerk, general

office clerk, security monitor or surveillance monitor, packer, or grader/sorter fit the criteria set

forth in the hypothetical, and a sufficient number of the positions were available in the national and local economy.  (*Id.* at 639-41)

In response to questions by Ervin's counsel, the VE testified that employers would have "tremendous fears" about hiring a person with mental health issues, and insufficient numbers of jobs exist in the national economy to accommodate an individual experiencing hallucinations. (*Id.* at 642-43)

### 4.    The ALJ's Findings

Based on the factual evidence and the testimony of Ervin and the VE, the ALJ determined that Ervin had not been under any type of disability within the meaning of the Act from October 1, 2006 through the date of his decision.  The ALJ's findings are summarized as follows:[3]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. Born on July 4, 1989, the claimant had not attained age 22 as of October 1, 2006, the alleged onset date (20 C.F.R. 404.102 and 404.350(a)(5)).

3. The claimant has not engaged in substantial gainful activity since October 1, 2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

4. The claimant has the following severe impairment: depression asthma (20 C.F.R. 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(B), except with the following nonexertional limitations: limited to simple, routine, unskilled jobs requiring low concentration and memory, but able to attend to tasks; limited to SVP 2 jobs, mild to moderately limited in performing activities of daily living, and

---

[3] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

interacting socially, and maintaining concentration, persistence, allowing her to avoid large crowds, lift 10 pounds frequently and 20 on occasion, sit for one hour and stand for one hour consistently on an alternate basis, avoiding temperature and humidity extremes, avoiding odors, gas, fumes, and substances.

7. The claimant has no past relevant work (20 C.F.R. 404.1565 and 416.965).

8. The claimant was born on July 4, 1989 and was 17 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

9. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

10. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2006 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(D.I. 11, Tr. at 15-25)

## III.  STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for

rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. §423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A

claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

**B.    Whether the ALJ's Decision is Supported by Substantial Evidence**

Ervin challenges the ALJ's RFC finding, claiming that the ALJ failed to include the severity of Ervin's impairments pursuant to the medical evidence of record. (D.I. 14 at 11) Ervin also alleges that the hypothetical question to the VE did not include all of Ervin's impairments. (*Id.* at 18) For the following reasons, the court finds that the ALJ's determination is supported by substantial evidence.

### 1.    The ALJ's Mental RFC Assessment

First, Ervin maintains that the Commissioner selectively credited certain portions of Dr.
Thompson's testimony, while rejecting contrary evidence that refutes the finding of no disability.
(D.I. 14 at 12) The record reflects that the ALJ properly evaluated the opinions of Drs. King and
Thompson. The ALJ afforded great weight to Dr. King's opinion of Ervin's residual functional
capacity, finding that Ervin should be able to sustain a basic work routine that does not require
much interaction with others. (D.I. 11 at 22, 535) Dr. King assigns partial weight to the opinion
of Dr. Thompson because Dr. Thompson's assessment of Ervin's abilities was not consistent
with his narrative report in that it overestimated the severity of Ervin's limitations. (*Id.* at 535)

Dr. King's opinion is supported by the observations of Dr. Thompson, who found that
Ervin was alert, well-oriented, and had good memory and intellectual functioning. (*Id.* at 23,
501) Dr. Thompson indicated that Ervin was able to carry out instructions and perform routine,
repetitive tasks with only mild limitation, even though she appeared to be experiencing a period
of acute depression during the examination. (*Id.*) As a result, the ALJ concluded that Ervin's
GAF score of 40[4] was not supported by Dr. Thompson's narrative. (*Id.* at 23) Dr. Thompson
acknowledged that the GAF score reflected an episode of acute illness and was not necessarily
representative of Ervin's baseline functioning. (*Id.* at 502-03) Therefore, substantial evidence
supports the ALJ's conclusion that the GAF score of 40 was inconsistent with the balance of Dr.
Thompson's report. "Although an ALJ must address GAF scores, like any other evidence in a
social security case, he may discount those scores or give them little weight if they are

---

[4] The GAF score allows a clinician to indicate his judgment of a person's overall psychological,
social and occupational functioning, in order to assess the person's mental health illness. *Stewart
v. Astrue*, 2012 WL 6538516, at *5 n.1 (M.D. Pa. Dec. 14, 2012) (citing *Diagnostic and
Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994)). A GAF score of 40 represents
"some impairment in reality testing or communication or major impairment in several areas, such
as work or school, family relations, judgment, thinking or mood." *Id.*

17

inconsistent with the record as a whole, so long as he explains his decision in that regard." *Byrd v. Astrue*, 2012 WL 3260358, at \*3 (W.D. Pa. Aug. 8, 2012) (citing *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)).

The ALJ also evaluated Dr. Thompson's opinion in conjunction with other medical evidence of record supporting the ALJ's conclusion. The ALJ observed that, following Ervin's inpatient and outpatient treatment at the Rockford Center in July 2008, she failed to see a mental health professional and did not take psychiatric medications for approximately one month. (D.I. 11 at 503-04) To obtain medical benefits, a claimant "must follow treatment prescribed by . . . [a] physician if . . . [that] treatment can restore . . . [the claimant's] ability to work." 20 C.F.R. § 404.1530. The record in the present case shows that Ervin has a history of failing to take her psychiatric medications or attend counseling. (D.I. 11 at 266, 268-69, 422, 482, 498, 503, 515) Moreover, Ervin's treatment notes suggest that when she followed the prescribed treatment regimen, her psychiatric symptoms were well-controlled. (*Id.* at 516) The evidence of Ervin's failure to seek or pursue medical treatment, without providing an explanation, further bolsters the ALJ's determination.

Second, Ervin contends that the ALJ improperly gave great weight to a vocational counselor's assessment after only one visit with Ervin. (D.I. 14 at 15) The regulations require the ALJ to formulate an RFC based on "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The vocational counselor's report demonstrates that Ervin believed that she was able to work and voluntarily sought the assistance of the vocational counselor. (D.I. 11 at 570) The ALJ did not improperly rely on the vocational counselor's assessment.

18

Third, Ervin argues that the ALJ incorrectly determined that her daily activities were not substantially restricted. (D.I. 14 at 17) The ALJ's RFC assessment includes an accommodation for an individual who is "mild to moderately limited in performing activities of daily living." (D.I. 11 at 21) This assessment establishes a middle ground between the opinions of Dr. King, who found no restriction on daily activities, and Dr. Thompson, who found a moderately severe restriction on daily activities during a period of acute illness. (*Id.* at 505, 530) Moreover, the record reflects that Ervin was capable of performing chores, visiting with friends, attending church, and attending a program to obtain her GED. (*Id.* at 45, 52-53, 55) Substantial evidence therefore supports the ALJ's determination that Ervin's daily activities were mildly to moderately limited. Based on the relevant medical evidence, the ALJ limited Ervin to simple, routine, unskilled SVP 2 jobs that require low concentration and memory and accommodated her mild to moderate limitations of activities of daily living, interacting socially, maintaining concentration and persistence and avoiding large crowds. (*Id.* at 21)

Finally, Ervin alleges that the ALJ failed to give weight to the opinion and medical records of Dr. Belford. (D.I. 14 at 18) However, the record reflects that the ALJ considered Dr. Belford's opinion and acknowledged that Dr. Belford believed Ervin would be unable to sustain competitive employment, but also described Ervin's noncompliance with treatment and failure to follow through with counseling or medication. (D.I. 11 at 23) The ALJ was not required to further assess Dr. Belford's opinion. *See Smith-Levering v. Barnhart*, 2004 WL 2211963, at *5 (D. Del. Sept. 27, 2004) (citing 20 C.F.R. §§ 404.1502, 416.902) ("Medical opinions based on treatment relationships occurring on a relatively infrequent basis may not warrant controlling weight in determining a case."); *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e) (a physician's

opinions on a claimant's residual functional capacity or inability to work due to disability are not controlling because they are decisions reserved for the Commissioner).

### 2.    The VE's Hypothetical

Ervin also contests the accuracy of the VE's opinion, alleging that the hypothetical posed by the ALJ did not accommodate all of her limitations. (D.I. 14 at 19-20)  Specifically, Ervin alleges that the hypothetical is inaccurate because she is unable to attend to tasks, has more than a mild to moderate limitation in performing daily activities, interacting socially, and maintaining concentration, persistence, or pace, and requires an absence from work of two to four weeks per year.  (*Id.*)

The court concludes that the hypothetical posed to the VE is supported by substantial evidence.  "[A]n ALJ's hypothetical must include all of a claimant's impairments" that are supported by the record. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).  Furthermore, the ALJ may only consider the VE's testimony if the hypothetical "accurately portrays the claimant's individual physical and mental impairments." *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).  As previously discussed, *see* § IV.B.1, *supra*, substantial evidence supports the ALJ's findings that Ervin was able to attend to tasks, and that Ervin had only a mild to moderate limitation in performing daily activities, interacting socially, and maintaining concentration, persistence, or pace.  Moreover, the ALJ reasonably found that Ervin's one to two episodes of decompensation were neither repeated nor of extended duration, and therefore do not require an accommodation of a yearly two to four week absence. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.00C.4 (episodes of decompensation of extended duration are defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.").

## V.   CONCLUSION

For the reasons stated above, I recommend that the court deny Ervin's motion for summary judgment (D.I. 13) and grant the Commissioner's cross-motion for summary judgment (D.I. 16).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).  The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available at http://www.ded.uscourts.gov.

Dated: August 30, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE